72 P.3d 182 (2003)
In re the Personal Restraint Petition of Ronald J. BRENNAN, Jr., Petitioner.
No. 49424-4-I.
Court of Appeals of Washington, Division 1.
May 12, 2003.
Publication Ordered June 26, 2003.
Christopher Gibson, Nielsen Broman & Koch, Seattle, WA, Ronald J. Brennan, Monroe, WA, for Appellant.
Mary K. Webber, Snohomish County Pros. Atty, Everett, WA, for Respondent.
*183 BAKER, J.
Several years after Ronald Brennan, Jr. was convicted of methamphetamine possession and sentenced, it became public that Michael Hoover, a chemist at the Washington State Patrol Crime Laboratory, had been using heroin sent to the crime lab for testing purposes. Hoover had tested the substance found on Brennan and determined it was methamphetamine. But there is no evidence that Hoover was using drugs when he tested the substance found on Brennan. And independent evidence established that the substance was methamphetamine. Finally, although Brennan argues that there was a Brady[1] violation, he cannot now raise this argument because he pled guilty. We therefore deny his personal restraint petition.

I
On November 15, 1996, police investigated a call from a motel that housekeepers had discovered what appeared to be drugs in one of the rooms. The room was registered to Ronald Brennan, Jr. While the police were interviewing witnesses, another man, Stuart Darren Ray, arrived at the room. Ray stated that he and Brennan were roommates, and admitted that there might be drugs in the room. The police obtained a search warrant, and found several bags containing white powder in the room. The powder field tested for methamphetamine.
When Brennan arrived, he was arrested and advised of his rights. During a search incident to arrest, officers found a small plastic bag on his person, the contents of which also field tested for methamphetamine. Later, Brennan gave a statement admitting to possessing methamphetamine and occasionally selling it.
The substances from the motel room and Brennan's person were sent to the state crime lab in Monroe. The following week, chemist Michael Hoover tested both, concluding that they contained methamphetamine.
The next month, Brennan was charged with possessing a controlled substance. Because of subsequent arrests and charges concerning the sale and distribution of methamphetamines to minors, Brennan entered into a plea agreement and pled guilty to this charge on May 29, 1998, eighteen months after his initial arrest.
In his plea of guilty Brennan stated that "On November 15, 1996, in Snohomish County, I knowingly and unlawfully possessed methamphetamine while armed with a firearm."
Michael Hoover began working as a chemist for the Monroe Washington State Patrol (WSP) crime lab in 1989. Shortly after Chemist James Boaz transferred to the lab in early 1997, he heard odd sounds, such as a razor blade on glass and snorting sounds, coming from Hoover's work station. Boaz was told that the sounds were because Hoover was taking antihistamines. Boaz observed other unusual behavior by Hoover. For example, when he approached Hoover's work station he noticed that Hoover "palmed" a large evaporating dish on his desk.
Later, in 1998 or 1999, chemists Boaz and David Northrop noticed that Hoover was assigning himself a disproportionately large number of heroin cases. Hoover also appeared to be removing heroin cases from other chemist's drawers and reassigning them to himself. Northrop requested that supervisor Erik Neilson assign all cases, but Hoover continued to remove heroin cases from the drawer of unassigned cases and self-assign them.
Boaz also observed that Hoover's lab data seemed sloppy. He suspected that Hoover was reducing his workload by repeatedly testing the same purified sample and applying the results across a number of cases, a practice known as "dry labbing." Boaz suspected that Hoover was dry labbing because, in Boaz's opinion, Hoover's data for separate criminal cases was too similar to have come from different samples. Boaz documented at least 14 possible dry labbing incidents between August and October 2000.
In November 2000, Neilson asked the Washington State Patrol to investigate Hoover. A hidden video camera placed above *184 Hoover's work station, revealed that Hoover was scraping the residue from evaporation dishes into small vials and hiding them on his person or around his workstation. The videotape also showed Hoover obtaining a hidden sample of a "dark substance" and placing it in his mouth.
Officers obtained a search warrant and interviewed Hoover on December 22, 2000, more than two years after Boaz began noticing that Hoover was taking heroin cases out of his drawer. Hoover eventually acknowledged that he had been taking heroin samples from evidence sent to the lab for testing, purifying it, and using it to treat his back pain. He also admitted that he frequently used heroin at the lab shortly before leaving work. Hoover was given a urine test, which tested positive for heroin.
Detectives also found seven test tubes at the back of Hoover's work station that appeared to contain controlled substances. The vials had various labels, including "meth" and "heroin." Testing revealed that six of the test tubes contained heroin, and one contained methamphetamine. Boaz and Northrop thought the quantity of material in the test tubes was larger than normal for "marker samples" kept in the work area.
Hoover was charged with evidence tampering and official misconduct. He pleaded guilty to both charges.
In August 2001 Brennan moved to withdraw his guilty plea, claiming that he had only pleaded guilty because he had no reason to contest the lab reports prepared by Hoover. In his personal restraint petition, he argues that the revelation that Hoover was using drugs creates a reasonable doubt as to the validity of the lab reports in his case, and that it would be manifestly unjust not to allow him to withdraw his guilty plea.

II
A personal restraint petitioner has the burden of proving constitutional error that results in actual prejudice or nonconstitutional error that results in a miscarriage of justice.[2] If a petition is based on matters outside the appellate record, a petitioner must show that he has "competent, admissible evidence" to support his arguments.[3] Also, "a petitioner must show that more likely than not he was prejudiced by the error. Bare allegations unsupported by citation of authority, references to the record, or persuasive reasoning cannot sustain this burden of proof."[4]
Brennan argues that because there are significant questions surrounding Hoover's drug use, including whether he properly tested methamphetamine samples, the fairness of the procedures followed in his case are at issue, citing State v. Roche.[5]
In Roche, this court reversed two convictions because Hoover's malfeasance broke the chain of custody and tainted the integrity of two trials. The court expressed concern that if the convictions were not overturned, the integrity of the criminal justice system might suffer:
The most important consideration for us now is the preservation of the integrity of the criminal justice system. We must handle these ... cases now before us in such a fashion that the public, the defense bar, the prosecuting attorneys, and the courts of Washington will clearly understand that we will not tolerate criminal convictions based on tainted evidence, but will insist upon proper standards of conduct and procedure.[[6]]
We do not believe that Roche requires us to grant Brennan's personal restraint petition. There are three significant differences between this case and Roche. First, Brennan pled guilty. On the guilty *185 plea form he was asked to explain in his own words the crime he committed. He wrote that "I knowingly and unlawfully possessed methamphetamine while armed with a firearm." In Roche, neither defendant pled guilty.
Second, there is independent evidence establishing that Brennan possessed methamphetamines. The substance taken from Brennan's person field tested positive for methamphetamine. And after receiving his Miranda[7] warning, Brennan confessed to possessing methamphetamines with the intent to sell them. In contrast, although police conducted a field test determining that the substances found in Roche's home were methamphetamines, the officers did not find the drugs on Roche, nor did Roche confess to possessing methamphetamines.
Finally, Brennan provides no temporal connection between Hoover's acts of malfeasance and Hoover's testing of the substance found on Brennan. The earliest direct evidence of illegal drug use by Hoover is in 1998. Although there is inconclusive evidence which might imply that Hoover was using heroin in mid-1997, there is no evidence even inferring his drug use before mid-1997, nearly six months after Hoover performed the test on the substances taken from Brennan. Again in contrast, there was compelling evidence in Roche establishing that Hoover was using heroin and dry labbing methamphetamine test results during the time he conducted the tests on the substances at issue in the challenged trials.
The absence of evidence suggesting that Brennan's test results were inaccurate, combined with a positive field test and his confession, support his guilty plea. The interests of justice do not require that Brennan be permitted to withdraw his guilty plea.
Brennan further argues that by not disclosing Hoover's drug use before Brennan pleaded guilty, the State violated his constitutional right to due process.
In the 1963 case of Brady v. Maryland,[8] the United States Supreme Court held that state prosecutors violate a defendant's right to due process when evidence favorable to a defendant is not disclosed.[9] The prosecutor's good faith is unimportant.[10] Further, a prosecutor has the duty to learn of evidence favorable to the defendant that is known to others acting on behalf of the government in a particular case, including the police.[11]
The purpose of holding police and others assisting prosecutors so accountable is that "[e]xculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it."[12] Otherwise, prosecutors could instruct those assisting them not to give the prosecutor certain types of information, resulting in police and other investigating agencies acting as the final arbiters of justice.[13]
A true Brady violation has three components: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.[14]
Although the prosecution cannot avoid its obligations under Brady by keeping itself ignorant of matters known to other state agents, it has no duty to independently search for exculpatory evidence.[15] And prejudice exists "`only if there is a reasonable probability that, had the evidence been disclosed *186 to the defense, the result of the proceeding would have been different.'"[16]
Brennan argues that a Brady violation occurred because Hoover did not disclose his malfeasance to the prosecutor or the defense. According to Brennan, the Brady rule applies because Hoover was an employee of a state investigative agency, and his activities would have provided exculpatory or impeaching evidence material to the defense.[17] He further seeks to apply Brady to Hoover's co-workers at the lab who observed unusual behavior in 1997 and harbored suspicions about Hoover's activities as early as 1998.
Essentially, Brennan alleges that the prosecution withheld evidence that could be used to impeach Hoover, in violation of Brady. He argues that this evidence would have raised doubt about the accuracy of the testing in his case, and thus he is entitled to withdraw his guilty plea.
Brennan's argument is foreclosed by United States v. Ruiz.[18] In Ruiz, the Supreme Court rejected the Ninth Circuit's conclusion that the constitution requires prosecutors to make certain impeachment information available to defendants before pleading guilty.[19]
Brennan has submitted no evidence that the tests performed by Hoover were inaccurate. Instead, he argues that because it is known that Hoover was using drugs at a later date, there is a reasonable doubt as to the validity of the tests. But Brennan pled guilty, and gave up "not only a fair trial but, also other accompanying constitutional guarantees."[20] One of those rights was to impeach any witnesses the state might call, including Hoover.[21] Accordingly, there was no Brady violation.
Brennan's personal restraint petition is denied.
GROSSE and ELLINGTON, JJ., concur.
NOTES
[1] Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[2] In re Personal Restraint of Cook, 114 Wash.2d 802, 813, 792 P.2d 506 (1990).
[3] In re Personal Restraint of Rice, 118 Wash.2d 876, 886, 828 P.2d 1086 (1992).
[4] State v. Brune, 45 Wash.App. 354, 363, 725 P.2d 454 (1986).
[5] 114 Wash.App. 424, 59 P.3d 682 (2000)
[6] Roche, 114 Wash.App. at 447, 59 P.3d 682 (adopting the reasoning of Snohomish County Prosecutor as its own).
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).
[8] 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[9] Brady, 373 U.S. at 87, 83 S.Ct. 1194.
[10] Brady, 373 U.S. at 87, 83 S.Ct. 1194.
[11] Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
[12] U.S. v. Zuno-Arce, 44 F.3d 1420, 1427 (9th Cir.1995).
[13] Kyles, 514 U.S. at 438, 115 S.Ct. 1555.
[14] Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
[15] In re Personal Restraint of Gentry, 137 Wash.2d 378, 399, 972 P.2d 1250 (1999).
[16] In re Personal Restraint of Benn, 134 Wash.2d 868, 916, 952 P.2d 116 (1998) (quoting U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).
[17] At least two state courts have found that a crime lab was part of the prosecution team in the context of disclosing evidence. See In re Brown, 17 Cal.4th 873, 72 Cal.Rptr.2d 698, 702, 952 P.2d 715 (1998) (holding that failure of crime lab to disclose evidence did not relieve prosecutor of obligation to review lab files for exculpatory evidence because "no serious dispute" that state run crime laboratory part of "investigative team"); Damian v. State, 881 S.W.2d 102, 107 (Tex.App.1994) (rejecting state's claim that evidence was never within prosecutor's possession because in possession of crime lab).
[18] 536 U.S. 622, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002).
[19] Ruiz, 122 S.Ct. at 2455.
[20] Ruiz, 122 S.Ct. at 2455.
[21] Ruiz, 122 S.Ct. at 2455.