IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-79,318-02





 

EX PARTE LEROY EDWARD COTY, Applicant






ON APPLICATION FOR A WRIT OF HABEAS CORPUS


CAUSE NO. 1264113 IN THE 180TH DISTRICT COURT


FROM HARRIS COUNTY





 Hervey, J., delivered the opinion of the unanimous Court. Price, J.,
filed a concurring opinion.


O P I N I O N 



 In this Court's opinion on original submission, we granted Applicant relief based
on a presumptive violation of his right to due process of law. See Ex parte Coty, No. WR-79,318-02 (Tex. Crim. App. June 5, 2013) (per curiam) (op. on orig. submission) (not
designated for publication). On our own motion, we withdrew our opinion, granted
rehearing, and ordered that this case be filed and set to answer "under what
circumstances, if any, [this Court] should presume a due-process violation in a case
handled by a forensic scientist who has been found to have committed misconduct in
another case." Ex parte Coty, No. WR-79,318-02 (Tex. Crim. App. June 26, 2013) (per
curiam) (not designated for publication). We will remand to the habeas court for
additional findings of fact and conclusions of law.

I. BackgroundA. Salvador

 The record reflects the following facts. Jonathan Salvador was a laboratory
technician at the Houston Police Department's Crime Lab Division. On January 26, 2012,
it was discovered that, during his six-year tenure, "Salvador committed 'professional
misconduct' [by] using the evidence in one case to support the evidence in another
case.'" (1) Additionally, the State filed a Brady disclosure, after the trial court signed its
findings of fact and conclusions of law, indicating that Salvador was implicated in a
second instance of "dry labbing" from April 2009. (2) Both matters were unrelated to
Applicant's case.

 The record also reflects that the Texas Forensic Science Commission ("TFSC")
determined in a published report that Salvador had problems throughout his employment
with the Texas Department of Public Safety ("DPS"), including "maintaining adequate
case output" and "more than 1 in 3 of [his] case folders were returned for corrections[,]"
usually administrative in nature. (3) DPS identified 4,944 cases that Salvador had worked on
during his employment. The TFSC estimated that, of the cases Salvador worked on, 50%-75% of those cases have evidence remaining that can be retested. Moreover, the record
shows that the Commission concluded that, although "Salvador fraudulently
misrepresented data after attempting analysis on a pharmaceutical drug exhibit[,] . . . there
was no evidence to suggest that there were property control issues of a systemic nature
that might preclude future re-testing of evidence." Eleven days after Salvador's
misconduct was discovered, DPS suspended Salvador, and Salvador resigned from his
position five months after he was suspended.

 In the wake of this situation, DPS notified the prosecuting attorneys and law-enforcement agencies, as well as others, (4) about the situation. In cases in which evidence
still existed, DPS retested the evidence handled by Salvador "during the ninety day period
surrounding the incident[,]" and as of the publication of TFSC's report, 440 additional
cases were also reexamined. The habeas court agreed with the TFSC's report, and it
concluded that "[t]o date this reanalysis has resulted in seven . . . corrective actions; this
represents a correction rate of less than 2%." (5) We understand the court to mean that, even
if the four corrective actions from the ninety-day period and the three corrective actions
from the other 440 cases are combined and compared to the 440 cases, Salvador had "less
than a 2%" error rate. (6) The record supports the court's findings of fact. Applications for
writs of habeas corpus based on Salvador's actions followed.

 Initially, this Court granted relief in a published opinion because "the lab
technician who was solely responsible for testing the evidence in this case is the scientist
found to have committed misconduct[,]" and the evidence in the case had been destroyed
and could not be retested. Ex parte Turner, 394 S.W.3d 513, 514 (Tex. Crim. App. 2013)
(per curiam). Later, we granted relief in unpublished opinions and extended our holdings
to cases in which evidence remained to be tested. See, e.g., Ex parte Smith, No.
AP-76,988, 2013 WL 831359, at *1 (Tex. Crim. App. Mar. 6, 2013) (per curiam) (not
designated for publication) (evidence remained to be retested but relief granted because
"that evidence was in the custody of the lab technician in question"); Ex parte Hinson,
No. AP-76,983, 2013 WL 831183, at *1 (Tex. Crim. App. Mar. 6, 2013) (per curiam)
(not designated for publication) (evidence remains to be retested but it was in the sole
custody of the lab technician and, as a result, is unreliable). We then issued our second
published opinion dealing with this issue and granted the applicant relief, although there
was sufficient evidence remaining to be retested. See Ex parte Hobbs, 393 S.W.3d 780
(Tex. Crim. App. 2013) (per curiam) ("This Court believes [that Salvador's] actions are
not reliable; therefore custody was compromised, resulting in a due process violation.").
The common factor in each "Salvador case" before this Court, whether unpublished or
published, is that this Court found a presumptive due-process violation in each case in
which he was the laboratory technician. The problem, of course, is that each case
Salvador worked on is not the same. (7) 

 We granted rehearing on our own motion and filed and set this case for the parties
to brief the Court regarding "under what circumstances, if any, [this Court] should
presume a due-process violation in a case handled by a forensic scientist who has been
found to have committed misconduct in another case."

B. Applicant's underlying case

 With respect to Applicant's underlying case, the habeas court made several
relevant findings of fact. Sergeant Orlando Jacobs stopped Applicant for failing to signal
a lane change and changing lanes in an unsafe manner. Based on Applicant's behavior
after stopping him, Jacobs suspected that Applicant might have had narcotics in the car.
Jacobs asked for consent to search Applicant's vehicle, and Applicant refused. A canine
named Rico was called to the scene, and Rico alerted the officer to the odor of narcotics.
Jacobs searched Applicant's vehicle and discovered a brown paper bag. Inside the bag
was a "Golden Puffs" cereal box that contained one bag of cocaine. On the video, when
Jacobs found the drug exhibit, he is heard stating that it looks like "half a kilo." A field
test of the substance performed by Jacobs returned a positive result for cocaine, and he
assessed its preliminary weight at 453 grams. Jacobs then submitted the evidence to the
Baytown DPS station and "placed the brown paper bag, the 'Golden Puffs' cereal box,
and the one . . . baggie containing the drug exhibit in a brown box, initialing where he has
sealed the box." The drug exhibit was described as "Properly Sealed 8.5x10x14 brown
box." When Jacobs appeared at the hearing at which the State argued that the habeas
court should hold an evidentiary hearing, Jacobs "observed the sealed brown box that he
checked into evidence . . . [,]" and he recognized "the box, 'Golden Puffs' cereal box, and
the one (1) baggie of cocaine as the same evidence he found in Applicant's automobile
and tagged into evidence."

 The habeas court also found that Salvador "exercised control over Applicant's
drug exhibit for a little more than 24-hours." Salvador checked out the evidence on June
14, 2010 at 12:54 p.m. and returned it to the "to be filed" drawer on June 15, 2010 at 2:16
p.m. Moreover, Salvador's description of the evidence was consistent with Jacob's
description, and Salvador noted that he tested only one exhibit, which is consistent with
Jacobs finding only one bag. Salvador's description of the drug exhibit was also
consistent with Jacobs's description at the time of arrest and the present-day contents of
the exhibit, including that the outside container was an "8.5x10x14 Brown Box," and the
"Inside Container" was a "Brown Paper Bag." Jacobs and Salvador also similarly
described the contents of the brown paper bag as a "Golden Puffs Cereal Box." Brian
Nacu, the laboratory technician charged with restesting the evidence in Applicant's case
31 months after Salvador's initial testing, agreed with Jacobs and Salvador as to the
description of the packaging of the evidence. He also concluded that when he received the
exhibit for retesting, it appeared that the proper procedures for preserving the chain of
custody were followed by Salvador, indicating that the evidence was not false because the
item Nacu checked out from evidence was the same evidence seized and checked into
evidence by Jacobs.

 As to the testing of the substance itself, the habeas court found, in relevant part,
that Salvador claimed to have performed a Gas Chromotograph Mass Spectrometer
("GCMS") confirmatory test, which is a test widely accepted in the scientific community
to identify unknown substances. Salvador concluded that the unknown substance was
cocaine, and that it had a weight of 496.63 grams. Salvador's report that the substance
contained cocaine passed a technical and administrative review. Brian Nacu's retesting
included two confirmatory tests, both widely accepted in the scientific community. One
test was the GCMS and the other was the Fourier Transform Infrared Test. Both tests
resulted in a positive finding for cocaine. Nacu identified the weight of the substance as
485.88 grams--a difference of 10.75 grams from Salvador and, according to the findings
of the trial court, an amount "attributable to the evaporation of chemical compounds
during the thirty-one . . . month period between the initial analysis and reanalysis."
Ultimately, Nacu concluded that Salvador's documentation was complete and similar to
his own, and he "found nothing to suggest that [Salvador] misidentified any substance or
failed to exert adequate effort to obtain a sample . . . ." Nacu's testing also satisfied
technical and administrative review by reviewers other than the ones that approved
Salvador's report. There were two other relevant findings of fact with respect to the
testing of the evidence. First, "[n]one of the other drug exhibits checked out of the drug
vault by [Salvador] on June 14, 2010, the date that he checked out [the evidence from
Applicant's case], involved a bulk cocaine exhibit." Second, "[s]amples tested on the
[GCMS] tray immediately before and after [the evidence in Applicant's case] were from a
different laboratory case number and were positive for a controlled substance other than
cocaine." Also, the record reveals that the drug-analysis letter from DPS signed by
Salvador, was dated June 16, 2010.

 Applicant was charged with possession with intent to deliver a controlled
substance weighing at least 400 grams. Tex. Health & Safety Code § 481.112(f). He
pled guilty to the lesser-included offense of possession of a controlled substance per his
plea-bargain agreement and was sentenced to 10 years' confinement on July 11, 2011. Id.
§ 481.115(f). He also waived his right to appeal as part of his plea bargain. Applicant,
however, filed an application for a writ of habeas corpus on March 18, 2013, alleging
that, due to Salvador's misconduct and the fact that the evidence was in the sole custody
of Salvador for a period of time, he was entitled to relief. 

 The habeas court did not hold an evidentiary hearing because the judge correctly
concluded that his recommendation to grant relief was "mandated due to the Court of
Criminal Appeals' holding in [Hobbs] . . . ." However, the trial court made other
conclusions of law, including that "[c]ompromises in a chain of custody generally
necessitate the presentation of evidence involving tampering or fraud specific to the
exhibit in question[,]" and that "[t]he Court concludes that there is no specific evidence
that [Salvador] confused, comingled, or compromised the test results . . . , or that
[Salvador's] analysis of Applicant's drug exhibit was unreliable." Despite those
conclusions, the habeas court recommended that we grant relief based on this Court's
opinion in Hobbs.

II. Arguments

A. The State

 The State argues that there should be a rebuttable presumption of invalidity "only
when the misconduct is so persistent and pervasive that it shocks the conscience of the
court[,]" and that Salvador's conduct did not rise to that level. Second, it asserts that, even
if this Court holds that there is a per se presumption of a due-process violation, courts
should review a number of factors and the totality of the circumstances of the case to
determine if the defendant was harmed. Specifically, the State suggests that deciding
whether a due-process violation should be presumed when a laboratory technician has
committed misconduct in another case should be a two-step inquiry: "(1) whether
misconduct is so egregious that the defendant is entitled to a presumption that misconduct
is present in his case; and (2) whether the defendant can demonstrate prejudice."

 The State explains that its proposed test is based on the jurisprudence of courts in
West Virginia and Washington State that have also dealt with cases involving laboratory
misconduct, (8) and the State argues that in West Virginia, a serologist "demonstrated a
pattern and practice of misconduct consisting of overstating and falsifying laboratory
results for more than a decade[,]" while in Washington State, a chemist regularly stole
and used heroin that had been sent to his laboratory for testing. The State asserts that we
should adopt the tests used in those jurisdictions. That is, "[b]oth jurisdictions concluded
that the respective forensic scientist's misconduct was so persistent and pervasive that it
shocked the conscience of the court. In other words, a rebuttable presumption of
invalidity applied to the technician's work during the documented period of
malfeasance[,]" but the courts also used a totality-of-the-circumstances test to assess
whether a defendant was harmed by the technician's error. The State also notes that the
Fifth Circuit, the Federal District of Massachusetts, the United States Court of Appeals
for the Armed Forces, and the Supreme Court of Nebraska have adopted the same
approach. (9)

 The State further argues that "Texas appears to be the only jurisdiction to embrace
a per se presumption of prejudice when a forensic scientist commits misconduct in
another case[,]" and that this Court and the Supreme Court of the United States have
cautioned that per se rules "should only apply when they will usually reach the correct
result as a matter of practice[,]" which is not the case here. See Cantu v. State, 930
S.W.2d 594, 600 (Tex. Crim. App. 1996) (citing Coleman v. Thompson, 501 U.S. 722,
737 (1991)). Moreover, the State argues that the presumption used by the Court in Hobbs
will not reach the correct result most of the time, and that such a presumption is
unrestrained by any temporal limitation; "years of valid analyses and convictions may be
unnecessarily tainted by a single act of malfeasance." Based on the extra-jurisdictional
cases cited, the State argues that, in lieu of a presumption of harm, this Court should
consider a series of nonexclusive factors to determine if a defendant suffered harm. (10)

 The State also argues that its proposed test and burden of proof is in step with this
Court's habeas-corpus jurisprudence holding that the burden of proof to obtain relief lies
with the applicant. See Ex parte Hogan, 556 S.W.2d 352, 353 (Tex. Crim. App. 1977).

 Finally, the State avers that the implications of this Court's temporally unrestrained
presumption of harm is profound because "[c]onvictions supported with significant
evidence, some perhaps decades old if the scientist is particularly experienced, would
stand to be unnecessarily reversed based on a single act of misconduct at any point in the
scientist's career. Cynicism rather than confidence in the criminal justice system is bred
by such an approach."

B. Applicant

 Applicant responds that the State's suggested standard of presuming a due-process
violation only when the technician's misconduct "shocks the conscience" is arbitrary and
fails to provide "guidance in approaching either the Salvador cases or future situations
involving systemic misconduct." Instead, Applicant suggests that this Court continue to
apply Hobbs and Turner. Applicant cites a number of reasons for his position. First, using
the State's proposed test "unfairly shifts the burden from the party whose agent created
the problem," and "expensive havoc" would result in any trial courts in which defendants
became aware of the misconduct. Also, Applicant asserts that the State could argue at a
new trial that the "results in a particular case are reliable, and that a conviction is
appropriate." Finally, Applicant explains that "[p]ost-conviction writ applications have
been drafted and findings entered in reliance on this Court's previous decisions[,]" this
Court's granting of relief in the "Salvador cases" sends an important zero-tolerance
message, and "a court disregards its own precedent at the risk of eroding the public's
confidence in its rulings." See Planned Parenthood of Se. Penn. v. Casey, 505 U.S. 833
(1992).

 Alternatively, Applicant argues that this Court should adopt a four-factor test to
determine if a laboratory technician's misconduct in another case should warrant a court
to presume a due-process violation, and under that test, a defendant could be
reprosecuted. Those proposed factors from Applicant include: (1) "[w]hether prior
decisions of this Court suggest that a due process violation should be presumed in the
situation under review"; (2) "[t]he number of cases affected and the relative seriousness
of the errors or intentional misconduct that has been discovered"; (3) "[w]hether
presuming a due process violation would deliver a strong message to both crime labs and
to the public that forensic misconduct will not be tolerated by this Court"; and (4)
"[w]hether presuming a due process violation would promote judicial economy under the
circumstances." Applying these factors, Applicant argues, must result in the conclusion
that Salvador's "negligent and intentional misconduct was significant enough that a due
process violation should be presumed as to all of his cases."

III. Discussion

 Based on the record in this case, Applicant's claim is most analogous to asserting
that the State used false evidence to convict him. Applicant's claim is that Salvador had
engaged in intentional laboratory misconduct without the knowledge of prosecutors, and
Applicant was convicted because Salvador's testing results indicated that Applicant
possessed almost one half of a kilogram of cocaine. Further, Applicant argues that
because Salvador was later shown to have committed intentional misconduct in more than
one case, this Court should continue to follow Hobbs. That is, Applicant asserts that we
should continue to presume that Salvador's sole possession of the drug exhibits made any
test results gleaned from those exhibits presumptively false or unreliable, and the falsity
in this case was material to Applicant's conviction--i.e., Applicant's due-process rights
were violated, and he is entitled to relief because of the allegedly false evidence used
against him.

 Ordinarily, to prove a false-evidence claim, the applicant must first show that the
evidence in his or her case was false, and second that the false evidence was material to
the applicant's conviction or punishment. See Ex parte Chavez, 371 S.W.3d 207-10 (Tex.
Crim. App. 2012). Under Hobbs and other opinions from this Court, we deviated from
that approach by presuming both that any evidence in the possession of Salvador or
generated by his alleged effort was false, and that the error was material to the applicant's
conviction. In this case, Applicant asks us to continue to apply a test that would presume
both falsity and materiality simply based on Salvador's misconduct in other cases. We
decline to do so for the reasons we describe below. Instead, we implement a shifting
burden as to the first issue of falsity, but with respect to the second
issue--materiality--we hold that the applicant must prove that the false evidence was
material to his or her conviction, even if an applicant can establish an inference of falsity
or actual falsity. 

 After thoroughly reviewing the record, the filed briefs, and cases from other
jurisdictions, we hold that an applicant can establish that a laboratory technician's sole
possession of a substance and testing results derived from that possession are unreliable,
and we will infer that the evidence in question is false, if the applicant shows that: (1) the
technician in question is a state actor, (2) the technician has committed multiple instances
of intentional misconduct in another case or cases, (3) the technician is the same
technician that worked on the applicant's case, (4) the misconduct is the type of
misconduct that would have affected the evidence in the applicant's case, and (5) the
technician handled and processed the evidence in the applicant's case within roughly the
same period of time as the other misconduct. Once the applicant satisfies this initial
burden by establishing the identified factors, the applicant has proven that the technician
in question has engaged in a pattern of misconduct sufficiently egregious in other cases
that the errors could have resulted in false evidence being used in the applicant's case.
However, as part of this inquiry, it is incumbent upon the applicant to establish the extent
of the pattern of misconduct the technician is accused of. (11) If Applicant can establish the
necessary predicate facts, then the burden shifts to the State to offer evidence
demonstrating that the laboratory technician committed no such intentional misconduct in
the applicant's case. We realize that rebutting an applicant's successful claim that we
should infer falsity will be an onerous burden, but we believe the burden is appropriate
considering the egregious nature of the actions of Salvador. We also note that the initial
burden on applicants to establish an inference of falsity is also onerous, and that, although
the State may not be able to rebut an inference of falsity easily, in many cases the State
will readily prevail on the materiality prong of the two-part test.

 Although the State, Applicant, and the amicus make compelling arguments, we
believe that the factors and process described above properly limit the likelihood that a
defendant will be convicted based on false evidence without unfairly setting aside
convictions obtained by the State. The suppression of evidence, because its use violates
principles of due process, is strong medicine and should not be used lightly. Moreover,
the remedy should be proportionate to the error. Although this test identifies a narrow
exception to the ordinary rule that falsity of evidence must be proven in each individual
case and cannot be established by identifying other cases in which a laboratory technician
has demonstrated a pattern of intentional laboratory misconduct, this case demonstrates
that such a limited exception is necessary. It would be an almost insurmountable burden
for each applicant to demonstrate unreliability amounting to falsity in his or her specific
case. However, it would be an equal miscarriage to disallow the State from presenting
evidence that shows that the applicant's allegations of unreliability in other cases should
not apply in the applicant's case because the custody of evidence and testing in that
applicant's case were performed properly or because there is other evidence showing that
the evidence was actually not false.

IV. Conclusion

 In the past, this Court has dealt with claims in connection to Salvador's work as
presumptive due-process violations in which we presumed that the evidence was false
(although Hobbs stated the status of the evidence in terms of reliability), and that the false
evidence was material to the applicant's conviction. However, we now recognize that it is
not appropriate to presume error and materiality in every case on which Salvador worked.
We believe the better method for resolving these claims is to allow an applicant to shift
the burden of the falsity issue to the State if the requisite predicate is proven, but the
burden of persuasion with respect to materiality will always remain with the applicant. (12)
Thus, even if the State fails to rebut an inference of falsity, an applicant still must prove
that the "false evidence" was material to his or her conviction. Having answered the
question that we filed and set this case for, we remand this cause to the habeas court to
apply the principles of this opinion in Applicant's case, including whether Applicant
established an inference of falsity, and if so, to what extent it was material. The issues
shall be resolved within 60 days after the mandate issues, and the supplemental record
shall be forwarded to this Court within 90 days. Any extensions of time shall be obtained
from this Court.

 Hervey, J.

Delivered: January 15, 2014


Publish
1. This is also colloquially referred to as "dry labbing." In this context, "dry labbing"
occurs when results of a test are actually arrived at by guesswork or using evidence or results
from another analysis. The Texas Forensic Science Commission concluded in its report that the
substance Salvador was testing when he engaged in one instance of professional misconduct was,
in fact, what he stated it was; however, he reached that result by using evidence from another
case to support his falsified, but accurate, results.
2. The record reflects that the habeas court signed its findings of fact and conclusions of
law on May 3, 2013. However, the State filed a Brady v. Maryland Disclosure and another
proceeding was held in this case on July 15, 2013. At that hearing, the State notified the court
that it had issued a Brady disclosure to Applicant regarding another instance of "dry labbing."
The disclosure filed by the State was admitted into the record as "Joint Exhibit No.1."

 In that other case from April 2009, Salvador tested cocaine. According to the joint exhibit
tendered by the State, a "reanalysis of the drug exhibit indicates that it [did] contain cocaine but
with a difference in quantity and type of adulterants between the two exhibits."
3. This record includes three reports issued by agencies of the State of Texas. One report
was published by the Texas Rangers, another by the Office of the Inspector General, and the last
by the Texas Forensic Science Commission. The habeas court heavily relied on the report from
the Texas Forensic Science Commission in its findings of fact and conclusions of law.
4. Other entities notified included the Texas Forensic Science Commission and the
American Society of Crime Laboratory Directors/Laboratory Accreditation Board.
5. This quote is from the habeas court's finding of fact number nine.
6. Without knowing how many cases existed in which evidence was retested during the
ninety-day period, it is impossible to determine Salvador's error rate in those cases, although we
know that he was issued four corrective actions in the unknown number of cases. If we compare
the total seven corrective actions to the known, additional 440 cases, the error rate would be
1.5909%. This was presumably what the habeas court meant in its finding of fact. Salvador's
error rate in the 440 cases, when compared to his three corrective actions in those cases, was
.6818%.
7. For example, in some cases a portion of the recovered substance remains in the custody
of the State, shows no indication of chain of custody issues, and can be retested, and in other
cases, the recovered substance was destroyed during the original testing or was disposed of for
some other reason. In some cases, the recovered substance was the only evidence of that criminal
defendant's guilt, while in other cases there was additional evidence of guilt, whether in the form
of different evidence (e.g., testimony or physical evidence) or evidence probative of guilt
obtained from the recovered substance before Salvador came into custody of it (e.g., a
presumptive field test, a positive alert by a K-9).
8. See, e.g., Matter of Investigation of West Virginia State Police Crime Laboratory Div.,
438 S.E.2d 501, 503 (W. Va. 1993); Matter of an Investigation of West Virginia State Police
Crime Laboratory, Serology Division, 445 S.E.2d 165, 168 (W. Va. 1994) ; In re Renewed
Investigation of State Police Crime Laboratory, Serology Division, 633 S.E.2d 762, 765 (W. Va.
2006); Burdette v. Zakaib, 685 S.E.2d 903, 910 (W. Va. 2009); In re Delmarter, 101 P.3d 111
(Wash. Ct. App. 2004); In re Brennan, 72 P.3d 182 (Wash. Ct. App. 2003); State v. Roche, 59
P.3d 682 (Wash. Ct. App. 2002).
9. See, e.g., State v. Edwards, 821 N.W.2d 680, 696-00 (Neb. 2012) (defendant entitled to
evidentiary hearing to prove that a forensic scientist who has falsified evidence in two other cases
also did so in the defendant's case and that "false evidence could have affected the jury's
verdict"); United States v. Williams, 985 F.2d 749, 752-57 (5th Cir. 1993) (denying
postconviction relief based on a claim of a break in the chain of custody caused by a forensic
laboratory technician who "had [allegedly] pilfered drugs from the lab's disposal file for personal
use" in other cases when the record provides "no reason to believe" that the technician actually
tampered with the applicant's drug exhibit, the defendant made furtive movements, and the
technician's conclusion was confirmed after retesting); Boyle v. Johnson, 93 F.3d 180 (5th Cir.
1996); United States v. Wilkins, No. 11-10217-RGS, 2013 WL 1899614, at *6-7 (D. Mass. May
8, 2013); United States v. Luke, 69 M.J. 309, 313-17 (C.A.A.F. 2011).
10. The factors described by the State include: (1) the results of retesting, (2) the temporal
proximity between the misconduct and the analysis or testimony, (3) the nature, extent, and
duration of the forensic scientist's misconduct, (4) the importance of the scientist's evidence to
the case as a whole, (5) whether there was a confession, (6) whether the conviction was secured
as the result of a guilty plea or a jury trial, (7) whether the forensic scientist testified at trial, (8)
the existence of a field test, if any, (9) the existence of audio, video, or eyewitness evidence, (10)
whether the defendant actually reviewed the forensic-science evidence, (11) whether the forensic-science evidence is fungible, (12) whether a chain of custody can be thoroughly documented,
(13) the proximity of the forensic evidence to the defendant when seized, and (14) whether the
forensic evidence was tested by a different scientist prior to the involvement of the forensic
scientist who committed the misconduct.
11. For example, did the intentional laboratory misconduct involve only a single type of
misconduct--"dry labbing"--or was the technician also proven to have stolen, comingled, or
otherwise contaminated drug exhibits? While, according to Applicant, Salvador's intentional
misconduct is limited to "dry labbing," other technicians across the country have been accused of
a wide variety of other outrageous behavior, including stealing drug exhibits and systemically
falsifying evidence for the prosecution.

 In this case, the scope of the inference of falsity established by Applicant with respect to
Salvador's work does not appear to extend to a categorical inference of falsity in all respects.
Instead Applicant alleges only that Salvador has engaged in a pattern of "dry labbing" (i.e.,
falsifying the results of testing). In such a case, it seems that the inference of falsity should be
limited to the pattern of intentional misconduct proven. We leave these issues for the convicting
court to resolve in the first instance on remand.
12. Issues of materiality that may need to be addressed include the nonexhaustive list of
issues described in footnote seven of this opinion. See supra note 7. However, we also note that
some types of evidence may be germane to both falsity and materiality.