# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53820-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| PHILLIP CONRAD GLEASON, | |
| Appellant. | |

MAXA, J. – Phillip Gleason appeals his convictions of second degree assault, drive-by shooting, and first degree unlawful possession of a firearm and his sentence. The convictions arose from an incident in which Gleason was riding in a car while fleeing from a police vehicle when he discharged a firearm at the pursuing vehicle. Gleason was convicted in a third trial, after the trial court declared a mistrial in the first trial and the second trial ended in a hung jury.

Regarding Gleason's convictions, we hold that

(1) the trial court did not err when it denied Gleason's motion to dismiss all charges on double jeopardy grounds after the first trial ended in a mistrial because the court found that the prosecutor had not intentionally provoked defense counsel into moving for a mistrial;

(2) there was sufficient evidence to show that Gleason committed the crime of drive-by shooting;

(3) Gleason's arguments that the State committed a number of discovery violations are precluded by his failure to assign error to relevant trial court discovery rulings that the State had no obligation to produce the materials at issue;

(4) the trial court did not err when it allowed the prosecutor to impeach him with the facts underlying a dismissed unlawful possession of a firearm charge;

(5) Gleason's multiple prosecutorial misconduct challenges have no merit because either he fails to show that he was prejudiced by the prosecutor's comments, he fails to cite to the record to allow for meaningful review, or the prosecutor's statements were not improper;

(6) the trial court did not err when it sustained two objections to defense counsel's closing argument for being a misstatement of the law and for failing to properly show that the missing witness doctrine was applicable;

(7) Gleason is not entitled to a new trial because of cumulative error; and

(8) Gleason's statement of additional grounds (SAG) claims either cannot be considered or have been addressed in his brief.

Regarding Gleason's sentence, we hold that (1) Gleason was not denied his right to counsel at sentencing when the trial court refused to continue the sentencing hearing after defense counsel had a medical emergency that day and her partner attended the hearing, but (2) the trial court erred when it imposed a 36-month firearm sentencing enhancement that corresponded to the second degree assault conviction that was vacated under the merger doctrine.

Accordingly, we affirm Gleason's drive-by shooting conviction and sentence, but we remand for the trial court to vacate the 36-month firearm sentencing enhancement.

FACTS

*Background*

In August 2014, several police officers responded to a report of an attempted armed robbery at a truck stop in Fife. The reporting party had provided a general description of a white male and an associated vehicle along with a license plate number for the vehicle.

Officer Salina Banales arrived at the truck stop in her patrol vehicle and saw a vehicle in the parking lot that matched the description given and confirmed that the license plate number was the same as the number reported. There was a woman in the driver's seat, later identified as Yolanda Lund, and a man in the passenger's seat, later identified as Gleason. Officer Dan Goff also arrived at the parking lot on foot.

Lund and Gleason got out of the vehicle and began walking toward the front door of the truck stop's convenience store. Banales and Goff approached Lund and Gleason and started to give them commands, but Lund and Gleason ran back to their vehicle. Banales pulled out her weapon and pointed it at the ground. Banales and Goff told them to stop, but Lund jumped into the driver's seat and Gleason jumped into the front passenger's seat. As Banales and Goff approached the vehicle, Lund started the vehicle, backed up and hit Goff, and drove away.

Banales and Goff both fired their guns several times at the vehicle as Lund was driving away toward Interstate 5. Officer Bryan Pitman activated his emergency lights on his patrol vehicle and pursued Lund and Gleason onto I-5. As he was merging onto the freeway, Pitman heard two gunshots come from Lund and Gleason's vehicle. He saw holes appear in the rear window and glass coming out of the rear window and falling on the ground.

Lund and Gleason eventually ended up in Morton, stayed with mutual acquaintances for a few days, and then went to Idaho. Lund and Gleason remained there for about a week. Lund then went back to Washington while Gleason stayed in Idaho.

Detective Jeff Nolta was involved with investigating and attempting to locate Lund and Gleason. Gleason was arrested in Idaho. Lund later was arrested in Tacoma.

The State charged Gleason with first degree assault with a firearm or deadly weapon against Pitman, drive-by shooting, and first degree unlawful possession of a firearm. Lund also

3

was charged with several crimes, and she later entered into an agreement with the State to plead guilty and to provide information about Gleason.

*First Trial*

Gleason's first trial began in October 2017. At trial, Nolta testified about his involvement with locating Lund and Gleason after the truck stop incident. On cross-examination, Gleason asked Nolta a series of questions challenging his investigative techniques, including whether his investigation involved looking into Gleason's social media accounts. Gleason also sought to introduce an undisclosed exhibit in an attempt to impeach Nolta regarding his ability to update his police reports in a timely fashion. Nolta testified that he looked at social media accounts, otherwise known as data mining, to find Lund and Gleason.

On redirect examination, the prosecutor asked Nolta a series of questions about his search of Gleason's social media account. These questions elicited testimony from Nolta that he found a picture of Gleason on social media that looked like he was inside a correctional facility.

Gleason objected at this point and moved for a mistrial on the grounds that Nolta's testimony violated an in limine order. Gleason argued that the State had been prohibited by the court from introducing evidence related to his past jail time. The prosecutor opposed the motion. She stated that she was attempting to rehabilitate Nolta's ability to do his job after Gleason on cross-examination had spent over an hour impugning his character and investigative techniques. The prosecutor argued that Gleason had opened the door as to what Nolta had done in terms of his investigative techniques and that she was trying to show the amount of work that Nolta had done to locate Gleason and Lund. The prosecutor also stated that there was no intention of publishing the actual social media photograph of Gleason.

After additional briefing and oral argument, the court determined that Nolta's testimony was so prejudicial that it warranted a mistrial. However, the court found that the State's line of questioning was not done with any malicious intent or with any desire to produce a mistrial.

Following the mistrial, Gleason filed a motion to dismiss the case on double jeopardy grounds, arguing that the prosecutor intentionally committed misconduct to cause a mistrial. After oral argument on Gleason's motion to dismiss, the trial court noted that it previously made a specific finding when it declared a mistrial that the State did not act with malicious intent or with any desire to produce a mistrial. The court declined to change its previous finding and reiterated that it continued to believe that there was no evidence to show that the State's line of questioning was done intentionally to provoke a mistrial.

The trial court denied Gleason's motion to dismiss. The court's order denying dismissal stated that it found "the State's actions were not done with intent to provoke a mistrial." Clerk's Papers (CP) at 133.

*Second Trial*

Before the second trial, Gleason moved to dismiss the case under CrR 8.3(b) in part on the grounds that the State failed to provide copies of Gleason's recorded jail phone calls that Nolta had listened to during his police investigation. The trial court denied Gleason's motion. The court stated that it was unclear whether the State had an obligation to turn over the recorded jail phone calls under CrR 4.7 and that Gleason relied on pure speculation to show prejudice. The court later entered an order stating that it found "no CrR 4.7 violation by [the] State in that it does not appear the court rule contemplated that [the] State must provide copies of all calls ever listened to by law enforcement between [a defendant] and a third party. Additionally, no prejudice shown." CP at 411.

5

The second trial ultimately resulted in a mistrial after the jury could not reach a verdict.

Gleason later filed a motion to compel the State to provide the same recorded jail phone calls at issue during the second trial, which the trial court denied. The trial court stated that the previous judge presiding over the second trial already had found that the contested jail phone calls were not discoverable and that they were not within the prosecutor's possession or control.

*Exclusion of BOLO*

Before the third trial, Gleason asked the trial court to admit a copy of the "be on the look out" (BOLO) notification that was distributed to law enforcement and the media after the truck stop incident to assist in locating Lund and Gleason. The BOLO described the vehicle that Lund and Gleason escaped in and stated that they left the truck stop with its rear window missing. The State apparently provided a copy of the BOLO to Gleason during discovery.

Gleason argued that the BOLO was admissible as a prior inconsistent statement because it contradicted Pitman's expected testimony that he saw two bullet holes appear in the vehicle's rear window while he was pursuing Lund and Gleason on the highway. Gleason also noted that the prosecutor had sent an email to a police officer that stated that she needed to talk to the officer about the BOLO because she did not believe it was admissible. The court ruled that the BOLO was inadmissible based on several levels of hearsay.

*Third Trial*

At the third trial, several people testified about the events that transpired the night of the incident and the subsequent events that led to Gleason's arrest.

Pitman generally testified to the facts above and stated that he followed Gleason and Lund's vehicle onto I-5 in his patrol vehicle. Pitman stated that as soon as he merged onto I-5 from the onramp, he heard two gun shots come from the vehicle he was following and saw holes

appear in the rear window. Pitman saw little specks of glass coming out of the rear window, hitting the ground and his tires.

Lund generally testified to the facts above and stated that there was always a gun in her vehicle. She also testified that she had given a gun to Gleason earlier that day. She stated that as they were driving away from the police, Gleason was rummaging around the front seat and she assumed he was trying to find a gun. Lund testified that when they were on I-5, she told Gleason to "[d]o something" and she subsequently heard a gun being fired at least once toward the back of the car in the pursuing police vehicle's direction. 10 Report of Proceedings (RP) at 1313.

Gleason testified that in 2014, he was working for his uncle and living in a clean and sober living residence. He also stated that he used to argue with Lund about her drug use and specifically methamphetamine, which she used every day.

Regarding the truck stop incident, Gleason testified that as he and Lund drove onto I-5, the back rear window already was broken. Gleason testified that on the day of the incident, nobody had a gun, nobody shot a gun from inside the vehicle, and that Lund had not given him a gun that day.

On cross-examination, the State asked Gleason about a third party who was sitting in the backseat of the vehicle he and Lund were in on the night of the incident. Gleason stated that one of Lund's friends was in the backseat and that he had mentioned that fact before this trial. At this point, defense counsel objected and made a motion for a mistrial. The trial court sustained defense counsel's objection, but denied the motion for a mistrial.

During redirect examination, Gleason testified that he did not have a gun because he was a felon who was not allowed to possess a gun. Over Gleason's objection, the trial court granted the State's request to ask Gleason the limited question about whether he was in a vehicle from

7

which a gun was recovered on a specific earlier date. The State then asked if Gleason was in the driver's seat of a vehicle during June 2014, where a firearm was recovered under that seat. Gleason responded yes. On redirect examination, Gleason explained that the vehicle he was in did not belong to him, the gun was not his, and he did not know that the gun was there.

Kay Sweeney testified as Gleason's expert in firearm-related evidence and crime scene reconstruction and summarized his findings about the report he wrote for the case. Sweeney previously had testified during the second trial. Part of his testimony included an explanation regarding the effects of firing a gun through a car's rear window as it related to two different accounts of where and how gunshots were exchanged between the police and Gleason.

Johan Schoeman testified as the State's rebuttal expert regarding the validity of Sweeney's forensic science report and opinion. On cross-examination, Schoeman confirmed that a glass expert from the Tacoma crime lab was present at a prior proceeding.

*Gleason's Jail Phone Calls*

At trial, Sergeant Michael Malave testified about his interview with Lund after she was arrested. Malave stated that during the interview, another officer told Lund that Gleason had offered to make a plea deal in exchange for giving information about where she was located. He explained that he could not recall if he found out about Gleason's statement from a recorded jail phone call he listened to or if he heard it secondhand from that officer. Malave stated that he offered to provide a similar plea agreement if Lund agreed to provide information on Gleason.

After Malave's testimony about listening to a recording of a jail phone call, Gleason moved to compel the State to produce copies of the recordings of the phone calls that Gleason made regarding a plea deal. During a voir dire examination, Malave clarified that he could not recall if he had listened to a recording of Gleason's phone call from jail that was left as a

8

voicemail on a department-issued cellphone or department desk phone. Malave was unsure if the police department's system allowed officers to save voicemails indefinitely. The prosecutor also stated that she was unaware of any recording of Gleason calling the police to make a plea deal.

The trial court denied Gleason's motion to compel. The court stated that there was no credible evidence that there was ever a recorded message and that the State had made all inquiries for recordings during discovery. The court explained that "[t]he prosecutor's obligations is limited to material information within the knowledge, possession or control. And it's clear . . . that the weight of the evidence is that the knowledge, possession or control of this particular document does not reach this criteria as required under [CrR] 4.7(a)(4)." 17 RP at 2065.

*Closing Arguments*

During closing argument, the prosecutor explained to the jury its responsibility to weigh the evidence and compared the elements of the crime in the to-convict instructions to a checklist. The prosecutor also stated that the State still had to prove each element beyond a reasonable doubt and explained that reasonable doubt exists when a juror "[doesn't] have an abiding belief about this element." 27 RP at 3352.

During rebuttal, the prosecutor referenced the fact that Lund had pleaded guilty to the crimes she was charged with. The prosecutor stated, "Lund has admitted and has pled guilty and was sentenced to the role that she played, and it is now Mr. Gleason's turn." 27 RP at 3463. Gleason did not object to this comment. The prosecutor also referenced Gleason's testimony that Lund was involved in drug use and he was not:

> [Gleason] has tried very hard to distance himself from [Lund]. She's crazy and she's always doing meth and she's awful and she's terrible. I mean, the clear theme

9

was she is clearly leading him. He's in a clean and sober. He's got his act together. He has a job; *that's what he says anyway*.

27 RP at 3455 (emphasis added). Gleason objected to this statement, which the trial court overruled.

During Gleason's closing argument, he discussed the meaning of an "abiding belief in the truth of the charge" as part of the State's burden to prove the elements of a charged crime beyond a reasonable doubt. The State objected to Gleason's description of an abiding belief, which the trial court sustained. The court also instructed the jury to disregard Gleason's comments.

Gleason also referenced testimony from Sweeney and why his expert testimony contradicted Pitman's version of the shooting that took place on the highway. Gleason stated that the State had its own glass expert but did not call him at trial. The State objected to Gleason's comment about a witness who was not called, which the trial court sustained.

*Conviction and Sentencing*

In December 2018, the jury acquitted Gleason of first degree assault and convicted him of second degree assault, drive-by shooting, and first degree unlawful possession of a firearm. In a special verdict form, the jury found that Gleason was armed with a firearm during the commission of second degree assault. In two special verdict forms, the jury found that Gleason committed second degree assault and drive-by shooting against a police officer who was performing his official duties at the time of the crimes and that he knew the victim was a police officer.

Sentencing was continued several times, primarily at Gleason's request. In May 2019, defense counsel filed a sentencing memorandum that argued that Gleason's second degree assault and drive-by shooting convictions violated double jeopardy and that under the merger doctrine, the two crimes should merge. Defense counsel argued that the first degree unlawful

10

possession of a firearm conviction should run concurrently to the other crimes and provided detailed argument about the length of the recommended sentence.

Shortly after filing her sentencing memorandum, defense counsel moved to continue sentencing because of personal health issues. Defense counsel appeared telephonically at the motion to continue hearing and stated that she had a medical emergency for a spine issue. She informed the trial court and the State that barring any unforeseen surgery complications, she would be able to appear in court after the week of June 13.

The trial court emphasized that Gleason had been convicted nearly six months earlier, that he had been in jail since then without being sentenced, and that the delay had been caused by defense counsel and Gleason. The court asked defense counsel if she had a backup attorney prepared in the event that she would be unavailable for sentencing. Defense counsel assured the court that she would prepare someone.

The trial court granted the continuance and emphasized to defense counsel that she needed to be available or have someone else available for sentencing on June 17. Defense counsel again assured the court that she would be there or that someone else would be there totally prepared.

At the sentencing hearing, defense counsel's law partner appeared before the trial court to represent Gleason. The law partner explained that defense counsel had a medical emergency that morning. As a result, he asked the court to grant a one-week continuance because he was not prepared to move forward with sentencing. The court denied his motion to continue because defense counsel had assured the court that sentencing would proceed no matter what that day and because her sentencing memorandum was extremely articulate.

11

During sentencing, the trial court repeatedly referenced defense counsel's May sentencing memorandum. Defense counsel's law partner also provided input during sentencing to the best of his abilities under the circumstances.

The court agreed with defense counsel's briefing on the merger issue and found that the second degree assault and drive-by shooting crimes merged. The court originally ruled that Gleason should be sentenced based on the second degree assault conviction because it was the greater offense of the two, but the State argued that the drive-by shooting conviction actually was the greater offense. Based on the State's argument, the court dismissed the second degree assault conviction.

The court sentenced Gleason to a total of 120 months in prison, which included concurrent 72-month sentences for drive-by shooting and first degree unlawful possession of a firearm, a consecutive 12-month sentence for the law enforcement victim aggravated circumstance, and a consecutive 36-month sentence for the firearm enhancement that corresponded to the dismissed second degree assault conviction.

Gleason appeals his second degree assault, drive-by shooting, and first degree unlawful possession of a firearm convictions, and his sentence.

ANALYSIS

A.     DOUBLE JEOPARDY BASED ON MISTRIAL

Gleason argues that the trial court erred in denying his motion to dismiss on double jeopardy grounds after his first trial ended in a mistrial. He claims that the prosecutor had acted in bad faith and intentionally provoked defense counsel into moving for a mistrial. We disagree.

   1. Legal Principles

   The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution protect a defendant "from being twice put in jeopardy for the same offense." *State v. Fuller*, 185 Wn.2d 30, 33, 367 P.3d 1057 (2016). Both provisions afford the same protections. *State v. Strine*, 176 Wn.2d 742, 751, 293 P.3d 1177 (2013). " 'The prohibition against double jeopardy applies when (1) jeopardy previously attached, (2) jeopardy was terminated, and (3) the defendant is again prosecuted for the same offense.' " *Fuller*, 185 Wn.2d at 34 (quoting *State v. George*, 160 Wn.2d 727, 741, 158 P.3d 1169 (2007)). Jeopardy attaches once the jury has been selected and sworn in. *Strine*, 176 Wn.2d at 752. Double jeopardy generally protects a defendant's right to be tried by the jury he selected. *State v. Juarez*, 115 Wn. App. 881, 887, 64 P.3d 83 (2003).

   The general rule is that double jeopardy does not bar a retrial if the defendant successfully moves for a mistrial. *State v. Lewis*, 78 Wn. App. 739, 745, 898 P.2d 874 (1995). Under the federal standard, an exception exists if the prosecutor intended to goad or provoke the defendant into requesting a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982); *see also State v. Benn*, 161 Wn.2d 256, 270, 165 P.3d 1232 (2007). This is a narrow exception. *Kennedy*, 456 U.S. at 673. Even prosecutorial misconduct that can be characterized as harassing or overreaching does not bar a retrial. *Id.* at 675-76.[1]

---

[1] The Oregon Supreme Court on remand applied a slightly different standard based on an interpretation of its state constitution. *State v. Kennedy*, 295 Or. 260, 276, 666 P.2d 1316 (1983). The court held that a retrial is barred when the prosecutor "knows that the conduct is improper and prejudicial and either intends or *is indifferent* to the resulting mistrial or reversal." *Id.* (emphasis added). Washington courts have declined to decide whether the federal standard or a standard similar to the Oregon rule applies under the Washington constitution. *See State v. Hopson*, 113 Wn.2d 273, 283-84, 778 P.2d 1014 (1989); *Lewis*, 78 Wn. App. at 746. However, Gleason cites only to the federal standard, and therefore we do not address whether a different standard should apply.

Whether the prosecutor intended to provoke a mistrial is a factual determination for the trial court. *Lewis*, 78 Wn. App. at 744. We review a challenge to a trial court's factual findings to determine if substantial evidence supports them. *Id.* Because findings as to intent are akin to a credibility determination and require "an evaluation of factors not readily apparent from the cold pages of an appellate transcript," we generally "defer to the firsthand observations and sound judgment of the trial court." *Id.* at 744-45.

### 2. Analysis

Here, the trial court found that the State's line of questioning that led to Nolta disclosing that he had found a photograph of Gleason inside a correctional facility on social media was so prejudicial that it warranted a mistrial. However, the trial court specifically found that the State did not act with intent to provoke a mistrial. The record shows that substantial evidence supports this finding. Accordingly, we hold that the trial court did not err when it denied Gleason's motion to dismiss.

### B. SUFFICIENCY OF THE EVIDENCE

Gleason argues that there was insufficient evidence to convict him of drive-by shooting because the State did not show that (1) Pitman was the specific victim as required by the to-convict instruction and (2) there was a conscious decision to specifically use a vehicle to transport a shooter or firearm to the scene of discharge. We disagree.

### 1. Standard of Review

When evaluating the sufficiency of evidence for a conviction, we view the evidence in the light most favorable to the State and ask whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). We assume the truth of the State's evidence and all reasonable inferences

drawn from that evidence. *Id.* These inferences must be construed in the State's favor and strongly against the defendant. *Id.* And we defer to the fact finder's resolution of conflicting testimony and evaluation of the evidence's persuasiveness. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Circumstantial evidence is as equally reliable as direct evidence. *Scanlan*, 193 Wn.2d at 770.

### 2. Analysis

RCW 9A.36.045(1) provides,

> A person is guilty of drive-by shooting when he or she recklessly discharges a firearm . . . in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge is either *from a motor vehicle* or from the immediate area of a motor vehicle that was *used to transport the shooter or the firearm, or both, to the scene of the discharge*.

(Emphasis added.) The trial court instructed the jury that the State had to prove that Gleason recklessly discharged a firearm and that "the discharge was either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm to the scene of the discharge." CP at 510.

The record shows that there was sufficient evidence to prove that Gleason discharged a firearm from a moving vehicle. Pitman testified that he heard two gunshots coming from their vehicle as he was chasing them and saw holes appear in the rear window. Lund testified that she heard a gun go off at least once toward the back of the vehicle in Pitman's direction.

Gleason points to the inconsistencies of Lund's testimony and the fact that he testified that he never shot a gun while they were being pursued by Pitman. But we assume the truth of the State's evidence. *Scanlan*, 193 Wn.2d at 770. And we defer to the jury's evaluation of conflicting testimony. *Homan*, 181 Wn.2d at 106.

15

The record also supports the jury's finding that the vehicle Lund was driving was used to transport Gleason and the firearm to the scene of discharge on I-5. As stated above, both Pitman and Lund testified that there was a shooting on I-5 during the police pursuit.

Gleason argues that there was no prior, conscious decision to drive a vehicle for the specific purpose of transporting a shooter or firearm to the scene of the discharge. But the plain language of RCW 9A.36.045(1) does not require a person to decide beforehand to use a car to transport a shooter or firearm for the sole purpose of committing the crime of drive-by shooting. Instead, the only mental state that must be proven beyond a reasonable doubt is recklessness.

We hold that there was sufficient evidence for a rational jury to conclude that the vehicle Lund was driving was used to transport Gleason or the firearm to the scene of the discharge.

C. ALLEGED DISCOVERY VIOLATIONS

Gleason argues that the State committed a number of discovery violations, including *Brady*[2] violations. We decline to address the merits of Gleason's arguments because he failed to assign error to the trial court's *Brady* rulings.

1. Legal Principles

CrR 4.7(a) outlines the prosecutor's discovery obligations in a criminal trial. Relevant here, CrR 4.7(a)(1)(ii) provides that the prosecutor must disclose to the defendant "any written or recorded statements and the substance of any oral statements made by the defendant." If a defendant requests information beyond what is listed under CrR 4.7(a), he or she must show that the requested information is material to the preparation of the defense. CrR 4.7(e)(1).

Under *Brady* and its progeny, the State is required to turn over all potentially exculpatory evidence or evidence that could be used as impeachment evidence. *State v. Mullen*, 171 Wn.2d

---

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

881, 894, 259 P.3d 158 (2011). But the State "has no duty to independently search for exculpatory evidence." *In re Pers. Restraint of Brennan*, 117 Wn. App. 797, 805, 72 P.3d 182 (2003). Nor does the State have an obligation to " 'volunteer information that it does not possess or of which it is unaware.' " *Mullen*, 171 Wn.2d at 895 (quoting *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 824 (9th Cir.1985)).

To establish a *Brady* violation, the defendant bears the burden to show that (1) the evidence at issue must be favorable to the defendant, either as exculpatory or impeachment evidence; (2) the State must have withheld the evidence; and (3) the evidence must be material to the defense. *State v. Davila*, 184 Wn.2d 55, 69, 357 P.3d 636 (2015).

2.  Recorded Jail Phone Calls

Gleason argues on appeal that the State had a duty to provide during discovery the recordings of his jail phone calls that Nolta reviewed during the course of his investigation. But Gleason does not assign error to and ignores the trial court's rulings that the State had no obligation to produce the requested recorded jail phone calls.

Gleason argued in the trial court during the second trial that the State's discovery violation regarding the recorded jail phone calls amounted to prosecutorial misconduct that warranted dismissal with prejudice under CrR 8.3(b). The trial court denied the motion, stating that it was unclear whether the State even had an obligation to turn over the recorded jail phone calls under CrR 4.7. The court also entered an order that there was "no CrR 4.7 violation by [the] State in that it does not appear the court rule contemplated that [the] State must provide copies of all calls ever listened to by law enforcement between [a defendant] and a third party. Additionally, no prejudice shown." CP at 411.

17

Gleason later filed a motion to compel discovery regarding the contested jail phone calls, which another judge denied. Specifically, the court stated, "As to the two phone calls, it sounds to me a decision has previously been made by another judge with respect to the discoverability issue of those. And you have another -- it doesn't seem to be it's something within the prosecuting attorney's possession or control." RP (Aug. 22, 2018) at 20.

As stated above, Gleason's argument is precluded by the fact that the trial court already had found that the State had no obligation to produce the requested recorded jail phone calls in two different rulings, none of which he assigns error to or even mentions. Unchallenged findings are treated as verities on appeal. *State v. Koeller*, 15 Wn. App. 2d 245, 255, 477 P.3d 61 (2020), *review denied,* 197 Wn.2d 1008 (2021).

In any event, Gleason does not explain whether the State had an obligation under CrR 4.7(a)(1)(ii) or *Brady* to turn over the recorded jail phone calls. And it is unclear how the alleged discovery or *Brady* violation prejudiced Gleason or was material. He cites only to Nolta's testimony from the second trial, which resulted in a mistrial. Therefore, we conclude that this argument fails.

3. Jail Phone Call Regarding Plea Deal

Gleason argues either that the State had a duty to produce in discovery certain recordings of his jail phone calls referenced by Sergeant Malave that allegedly showed that Gleason had called the police to request a plea deal in exchange for providing information on Lund.

Gleason raised the same challenge during the third trial in his motion to compel discovery, but the trial court found that the State had no obligation to turn over the alleged recordings because there was no credible evidence that the challenged recordings even existed. The court ruled that any such recordings were not within the State's the knowledge, possession

18

or control. Gleason does not assign error to or even mention this ruling. Therefore, the ruling is a verity on appeal. *Koeller*, 15 Wn. App. 2d at 255.

Gleason argues in his reply brief that his discovery violation assignment of error necessarily implied that he also was assigning error to the trial court's order denying his motion to compel discovery and related findings. We reject Gleason's argument because his failure to assign error extends beyond just a mere technical violation of RAP 10.3(a)(4).

Even if we were to address Gleason's challenge, he provides no meaningful argument and cites to no legal authority in support of his *Brady* challenge. Gleason merely recites the relevant facts of the case in the light most favorable to him and makes a conclusory statement that the alleged discovery violation hindered his ability to confront the State's claim that he was ready to make a plea deal in exchange for providing information on Lund. Therefore, we conclude that this argument fails.

4. Email regarding BOLO

Gleason argues that the State had a duty to provide in discovery a copy of an email that the prosecutor sent to a police officer who issued the BOLO expressing her concern about its admissibility. However, the trial court ruled that the BOLO was inadmissible. Therefore, there is not a reasonable probability that an email suggesting that the BOLO was inadmissible would change the outcome of the trial. This argument fails.

D. EVIDENTIARY RULING REGARDING DISMISSED FIREARM CHARGE

Gleason claims that the trial court erred in allowing the prosecutor to impeach him with a dismissed charge for unlawful possession of a firearm because such evidence was unduly prejudicial and had no probative value. We disagree.

19

Under ER 401, evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Irrelevant evidence is not admissible. ER 402. The threshold for admitting relevant evidence is low; there must only be minimal relevance. *State v. Horn*, 3 Wn. App. 2d 302, 312-13, 415 P.3d 1225 (2018). Under ER 403, relevant evidence can be excluded if its probative value is substantially outweighed by its prejudice. We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Burke*, 196 Wn.2d 712, 741, 478 P.3d 1096, *cert. denied,* 142 S. Ct. 182 (2021).

Gleason incorrectly implies that the trial court allowed the prosecutor to reference an unlawful possession of a firearm charge against him that previously had been dismissed. Instead, the prosecutor asked about the facts underlying the dismissed charge – that a few months before the truck stop incident he was in the driver's seat of a car when a firearm was discovered under that seat. The question was asked to impeach Gleason's testimony that he did not have guns and could not be around them.

Gleason did not dispute that a gun was found under the seat in which he was sitting. He argued that evidence should have been excluded because the search during which the gun was found was ruled to be improper, and because he did not own the car and he did not know the gun was there.

However, even if the search was improper and evidence regarding the gun could not be used to convict Gleason in the earlier case, we conclude that the evidence could be used for impeachment purposes in this case. *See State v. Greve*, 67 Wn. App. 166, 170-75, 834 P.2d 656 (1992) (recognizing that article 1, section 7 of the Washington Constitution does not necessarily

bar the use of suppressed evidence for purposes of impeachment, and admissibility is determined on a case-by-case basis).

In addition, this evidence was relevant because it allowed an inference that Gleason's testimony that he was not around guns was false. And the evidence was not unfairly prejudicial because the unlawful possession of a firearm charge was not mentioned and Gleason was able to testify that he did not own the car and did not know the gun was there, and to explain why he was in the car.

We hold that the trial court did not abuse its discretion in allowing the prosecutor to ask about the incident in which a gun was found near Gleason.

E.      PROSECUTORIAL MISCONDUCT

Gleason argues that the prosecutor committed several acts of misconduct during the presentation of evidence and closing arguments. We disagree.

1.    Legal Principles

To establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the record and all of the circumstances of the trial. *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020).

During closing argument, it is improper for a prosecutor to present facts not admitted as evidence during the trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 705, 286 P.3d 673 (2012). It also is improper for the prosecutor to misstate the evidence presented at trial. *See State v. Walker*, 182 Wn.2d 463, 478-79, 341 P.3d 976 (2015). And arguments that misstate or shift the State's burden of proof beyond a reasonable doubt or arguments that misstate the law constitute prosecutorial misconduct. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015) (misstate the law); *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014) (burden of proof).

21

However, the prosecutor is given wide latitude to assert reasonable inferences from the evidence. *Glasmann*, 175 Wn.2d at 704.

It is improper for a prosecutor to state a personal opinion as to the defendant's guilt. *Lindsay*, 180 Wn.2d at 437. And a prosecutor cannot state his or her personal belief that the defendant is lying. *See State v. Copeland*, 130 Wn.2d 244, 290-91, 922 P.2d 1304 (1996). But a prosecutor may argue that the defendant is not telling the truth if the prosecutor refers to specific evidence that supports an argument that the defendant lied. *Id.* at 291-92.

When the defendant fails to object at trial, he or she is deemed to have waived any claims of prosecutorial misconduct unless the misconduct was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). The defendant must show that (1) a curative instruction would not have eliminated any prejudicial effect and (2) the misconduct had a substantial likelihood of affecting the verdict. *Id.* at 761. Reviewing courts should focus more on whether the resulting prejudice could have been cured and less on whether the prosecutor's misconduct was flagrant or ill intentioned. *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 165-66, 410 P.3d 1142 (2018).

2. Presentation of Evidence

Gleason argues that the prosecutor engaged in misconduct when she repeatedly ignored the trial court's rulings on objections while examining witnesses. However, the trial court sustained all of the objections that Gleason referenced. And he does not explain how he was prejudiced by the prosecutor continuing to ask objectionable questions. We conclude that this claim fails.

### 3.  Comment Regarding a To-Convict Check List

Gleason argues that the prosecutor misstated the burden of proof when she compared the reasonable doubt standard to a checklist and failed to clarify that the State bore the burden to prove every element of a crime beyond a reasonable doubt.  We disagree.

Gleason appears to take issue with the prosecutor's following statements:

> [Y]ou've now been given all of the evidence, whether it be by testimony or by physical evidence, the question is have you been given enough information in whatever format to be able to go through the elements of each of the three crimes of which [Gleason] is charged and answer each of those questions, the elements, *the checklist* in other words, and determine whether or not that element has been satisfied beyond a reasonable doubt.

27 RP at 3351-52 (emphasis added).

When the prosecutor's reference to a checklist is read in its entirety, it is clear that the prosecutor intended the jury to use the elements of a crime themselves as a checklist to evaluate the evidence.  And the prosecutor emphasized that the State had to prove each of those elements beyond a reasonable doubt.  The prosecutor even described reasonable doubt as not having "an abiding belief about this element because of whatever reason, the lack of information, or because of some affirmative thing that somebody said, well, that's different."  27 RP at 3352.  This argument fails.

### 4.  Comment on Length of Incarceration

Gleason argues that the prosecutor committed misconduct when she stated during closing arguments that he was motivated to lie because he knew he would receive a "substantial" sentence if convicted.  He contends that it was improper for the prosecutor to comment on the length of his sentence.  But Gleason fails to identify any place in the record where the prosecutor stated that Gleason's potential sentence was "substantial."  Therefore, this argument fails.

5.   Comment Regarding Gleason's Truthfulness

Gleason argues that the prosecutor improperly gave her opinion about his truthfulness. We disagree.

Gleason appears to take issue with the prosecutor's following statement:

> [Gleason] has tried very hard to distance himself from [Lund].  She's crazy and she's always doing meth and she's awful and she's terrible.  I mean, the clear theme was she is clearly leading him.  He's in a clean and sober.  He's got his act together. He has a job; *that's what he says anyway*.

27 RP at 3455 (emphasis added).  However, the prosecutor simply was pointing out that the jury did not have to believe what Gleason said.  It is not improper for a prosecutor to question a defendant's credibility.  *Copeland*, 130 Wn.2d at 290-91 (stating that prosecutors may argue inferences from the evidence, including a defendant's credibility).  This argument fails.

6.   Comment on Gleason's Turn to Take Responsibility

Gleason argues that the prosecutor committed misconduct when she argued in rebuttal that Lund had pleaded guilty and it was now his turn to take responsibility for the charged crimes.

During rebuttal, the prosecutor stated, "Lund has admitted and has pled guilty and was sentenced to the role that she played, and it is now Mr. Gleason's turn."  27 RP at 3463.  But Gleason concedes that he failed to object to the prosecutor's comments during rebuttal.  Even if we assume that the statement was improper, Gleason does not provide any meaningful analysis as to why it was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice."  *Emery*, 174 Wn.2d at 760-61.  This argument fails.

F.      LIMITING GLEASON'S CLOSING ARGUMENT

Gleason argues that the trial court erred when it sustained the State's objections to (1) his descriptions of an "abiding belief" during closing arguments and (2) his comments regarding the State's failure to call a glass expert retained for a previous trial.  We disagree.

1.      Legal Principles

A defendant's Sixth Amendment right to counsel and due process rights may be implicated when a trial court improperly limits the scope of counsel's closing argument.  *State v. Osman*, 192 Wn. App. 355, 368-69, 366 P.3d 956 (2016).  The right to counsel includes the right to make closing argument on behalf of the defense.  *Id.* at 368.

However, a trial court has broad discretion over the scope of closing argument.  *Id.*  A trial court can limit closing argument if it goes beyond the facts in evidence and the applicable law and thereby confuses or misleads the jury.  *State v. Goss*, 186 Wn.2d 372, 383, 378 P.3d 154 (2016).  We review a trial court's decision to limit closing argument for an abuse of discretion.  *Id.*  A trial court abuses its discretion when no reasonable person would adopt the trial court's view.  *Id.*

2.      Abiding Belief Argument

Gleason argues that the trial court erred when it sustained the State's objection to his discussion of an "abiding belief" during closing argument. We disagree.

In *Osman*, the court held that the trial court erred when it sustained the State's objection to defense counsel's definition of "abiding belief" during closing arguments.  192 Wn. App. at 377.  Defense counsel argued during closing argument,

> But what jury instruction number three the last sentence reads is that "if you have *an abiding belief of the truth of the charge*" what does that mean?  It means that if you find Harun guilty *the minute you walk out of this courthouse that's your*

25

> *decision you can't change your mind and look back and say I wonder if I made a mistake.*
>
> *A month from now when maybe you're talking to people about your experience you can't go back and say maybe I made a mistake.*

*Id.* at 374 (emphasis added). The State objected to defense counsel's description of "an abiding belief of the truth of the charge," which the trial court sustained. *Id.* at 374.

The court concluded that defense counsel's description of "an abiding belief of the truth of the charge" was not a mischaracterization of the State's burden of belief because the term referenced "both duration and the strength and certainty of a conviction." *Id.* at 375.

Here, the trial court's reasonable doubt instruction is not in the record. But the pattern instruction reads as follows:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01 (3d ed. Supp. 2008) (WPIC). The State's proposed reasonable doubt jury instruction tracked the language from WPIC 4.01, which is the same instruction used in *Osman*, 192 Wn. App. at 373.

During closing argument, Gleason discussed the meaning of "an abiding belief in the truth of the charge" as it relates to the State's burden to prove the elements of a charged crime beyond a reasonable doubt. He argued,

> Words have their common and ordinary meaning in the law. Abiding. Abiding. Abide with me. What's abiding mean? You're all intelligent people. What does that mean? It doesn't mean something -- it doesn't mean an abiding belief.
>
> And how do you know if you have an abiding belief in the jury room? That's really not a very helpful standard, because the instruction says that you are to presume that the defendant is innocent throughout your deliberations until the moment that you – the presumption continues throughout the entire trial unless during your

26

deliberations, at that point in your deliberations you find it has been overcome by evidence beyond a reasonable doubt.

So it continues in your deliberations. And so at some point you might find that they've proven the case beyond a reasonable doubt. At that point you're probably not going to have an abiding belief because you won't have a lot of time to form an abiding belief.

27 RP at 3423-24. The trial court sustained the State's objection to these comments.

Unlike in *Osman*, Gleason's description of an "abiding belief" was circular, confusing, and a misstatement of the law. First, Gleason stated that an abiding belief "doesn't mean an abiding belief," which is a contradictory and unhelpful statement.

Second, he argued that when the jury "find[s] that [the State has] proven the case beyond a reasonable doubt . . . [the jury] probably [is] not going to have an abiding belief because [the jury] won't have a lot of time to form an abiding belief." 27 RP at 3424. This statement suggested that the jury cannot have an abiding belief regarding guilt when they already have found that the State has proven its case beyond a reasonable doubt. This is a clear misstatement of the law because having "an abiding belief" about whether the State has met its burden of proof refers to having " 'a subjective state of near certitude of the guilt of the accused.' " *Osman*, 192 Wn. App. at 375 (quoting *Victor v. Nebraska*, 511 U.S. 1, 14-15, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994)).

Gleason argues in his reply brief that *Osman* actually helps his argument because he was attempting to explain that "abiding" means something longer lasting than a momentary conviction. Gleason appears to be referring to defense counsel's later closing argument statements to the jury, "Is abiding belief formed in two seconds, or does it require something a bit longer." 27 RP at 3425. But the State did not object to this portion of Gleason's description

27

of an abiding belief, and therefore these later abiding belief statements were never at issue in the trial court.

We hold that the trial court did not err when it sustained the State's objection to Gleason's initial descriptions of an "abiding belief" during closing argument.

### 3. Missing Witness Argument

Gleason argues that the trial court erred when it sustained the State's objection to his closing argument comments regarding the State's failure to call its glass expert. We disagree.

#### a. Legal Principles

A party may comment on the absence of a witness during closing argument when the missing witness doctrine applies. *See State v. Blair*, 117 Wn.2d 479, 488, 816 P.2d 718 (1991). "Under the doctrine, if a party fails to call a witness to provide testimony that would properly be part of the case, the testimony would naturally be in the party's interest to produce and the witness is within the control of the party, the jury may be allowed to draw an inference that the testimony would be unfavorable to that party." *State v. Dixon*, 150 Wn. App. 46, 54-55, 207 P.3d 459 (2009).

"[I]n the context of failure of the State to call certain witnesses, . . . the [unfavorable] inference arises 'only where, under all the circumstances of the case, such unexplained failure to call the witnesses creates a suspicion that there has been a willful attempt to withhold competent testimony.' " *Blair*, 117 Wn.2d at 488 (quoting *State v. Baker*, 56 Wn.2d 846, 859-60, 355 P.2d 806 (1960)).

There are certain limitations to the missing witness doctrine. *Blair*, 117 Wn.2d at 488. First, the missing witness doctrine applies only when the potential testimony is material and not cumulative. *Id.* at 489. The importance of the witness's testimony is fact-dependent. *Id.*

Second, "[i]f a witness's absence can be satisfactorily explained, no inference is permitted." *Id*. Accordingly, "[t]he missing witness doctrine must be raised early enough in the proceedings to provide an opportunity for rebuttal or explanation." *State v. Montgomery*, 163 Wn.2d 577, 599, 183 P.3d 267 (2008).

The party seeking to invoke the missing witness doctrine does not need to prove that there was willful suppression of evidence. *Blair*, 117 Wn.2d at 488. Instead, there only needs to be a reasonable probability that the party against whom the missing witness rule was sought to be applied did not call the witness in question because the witness's testimony would have been damaging. *Id*. Mere circumstantial evidence is insufficient to meet the threshold of reasonable probability. *State v. Mark*, 34 Wn. App. 349, 352-53, 661 P.2d 157 (1983).

      b.    Analysis

Here, Gleason argued during closing argument that the State had the ability to refute Sweeney's testimony regarding where and how gunshots were exchanged between the police and Gleason, yet pointed out that the State had failed to offer any testimony from the glass expert it had retained for a previous proceeding. As noted by the State's objection, Gleason attempted to invoke the inference provided under the missing witness doctrine against the State without first showing to the trial court that the doctrine even applied. Gleason also was required to invoke the missing witness doctrine before closing arguments to provide the State the opportunity to explain the glass expert's absence if he wanted the benefit of the rule. *See Montgomery*, 163 Wn.2d at 599.

Regardless, the circumstances of the case do not show that the missing witness doctrine applied. It was speculative for Gleason to argue that the mere fact that the State had a glass expert during the second trial meant that there was a reasonable probability that the same glass

expert did not testify because his or her testimony would have undermined the State's case during the third trial. *See Mark*, 34 Wn. App. at 352-53. In addition, the State's glass expert did not appear to be material and likely would have been cumulative in light of the fact that Schoeman testified as the State's rebuttal expert to Sweeney's testimony. Given the narrow application of the missing witness doctrine, it was well within the trial court's broad discretion to limit the scope of closing arguments by sustaining the State's objection to Gleason's comments regarding the absence of the glass expert.

Accordingly, we hold that the trial court did not err in sustaining the State's objection to Gleason's comments during closing arguments about the failure to produce a previously retained glass expert.

G.    CUMULATIVE ERROR

Gleason argues that he is entitled to a new trial based on the cumulative error doctrine. Under this doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Here, Gleason has not demonstrated that any error denied him a fair trial. Therefore, we hold that the cumulative error doctrine is inapplicable.

H.    SAG CLAIMS

Gleason makes several assertions in his SAG. We reject these assertions because they either rely on matters outside the record or already have been addressed above.

1.    Matters Outside the Record

Gleason argues that (1) the trial court erred when it refused to grant a subpoena for an officer who had retired after the second trial and (2) the prosecutor committed misconduct when she told a witness what to testify about during a break in the proceedings.

We reject these claims because they rely on matters outside the record or the record is insufficient to evaluate the claims. First, the record does not show that Gleason ever formally requested the trial court to issue a subpoena for the officer, and if he did, the trial court's decision on the matter is outside the record. Second, Gleason's allegation regarding prosecutorial misconduct involve conversations that are not part of the record.

As a result, we cannot consider these assertions in this direct appeal. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). Instead, they must be raised in a personal restraint petition. *Id.*

### 2. Additional Prosecutorial Misconduct Claim

Gleason argues that the prosecutor made several statements during trial or closing argument that were not supported by the record or an improper comment on his guilt or credibility. First, some of Gleason's arguments were raised in his brief and addressed above. Second, the record does not show that the prosecutor ever stated that "[Gleason's] memory is directly influenced by what [he has] to lose." SAG at 2. We are not obligated to search the record in support of Gleason's claims. RAP 10.10(c); *State v. Thompson*, 169 Wn. App. 436, 493, 290 P.3d 996 (2012).

Accordingly, we reject Gleason's prosecutorial misconduct claim.

## I. RIGHT TO COUNSEL AT SENTENCING

Gleason argues that he was denied his right to counsel during sentencing in violation of his constitutional rights. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution provide a criminal defendant with the right to counsel at all critical stages of criminal prosecution, including sentencing. *See State v. Robinson*, 153 Wn.2d 689,

694, 107 P.3d 90 (2005). We review de novo allegations of constitutional violations. *State v. Johnson*, 180 Wn.2d 295, 300, 325 P.3d 135 (2014).

Here, defense counsel experienced a medical emergency on the morning of sentencing and could not attend. Gleason was represented at sentencing by defense counsel's law partner. But Gleason argues that he did not have meaningful representation at sentencing.

Even though defense counsel was not present, she filed a detailed sentencing memorandum, which the trial court acknowledged as extremely articulate and well-argued. The court repeatedly referenced the sentencing memo during the course of the proceeding. The court ultimately agreed with defense counsel's briefing on whether the drive-by shooting and second degree assault conviction merged and dismissed the assault conviction. And defense counsel's law partner also provided input during sentencing.

Under the circumstances of this case, we hold that Gleason was not denied a right to counsel during sentencing.

J.     SENTENCING ERROR

Gleason argues, and the State concedes, that the trial court erred when it imposed the 36-month firearm sentencing enhancement that corresponded with the vacated second degree assault conviction. However, the State argues that the trial court erred when it found that the drive-by shooting conviction was the greater offense of the two and that on remand, the trial court should vacate the drive-by shooting conviction and impose a sentence based on the second degree assault conviction instead. We accept the State's concession that the trial court erred in imposing the sentencing enhancement, but we decline to address the State's argument because it did not cross-appeal.

1. Legal Principles

The merger doctrine is a rule of statutory construction that courts use to assist in determining whether separate convictions violate double jeopardy. *In re Pers. Restraint of Knight*, 196 Wn.2d 330, 337, 473 P.3d 663 (2020). " 'Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime.' " *Id.* at 337 (quoting *State v. Freeman*, 153 Wn.2d 765, 772-73, 108 P.3d 753 (2005)). When two convictions merge, the remedy is to vacate the lesser offense. *See State v. Muhammad*, 194 Wn.2d 577, 627-28, 451 P.3d 1060 (2019).

In addition to vacating the lesser offense, any sentencing enhancements tied to the lesser offense also must be vacated. *State v. Davis*, 177 Wn. App. 454, 465 n.10, 311 P.3d 1278 (2013). "If an offense is vacated and the defendant is not sentenced for it, RCW 9.94A.533 does not provide a basis for imposing a term for the corresponding firearm enhancement." *Id.*

2. Analysis

As stated above, we accept the State's concession that the firearm sentencing enhancement must be vacated because there is no legal basis for the firearm enhancement to survive the vacated second degree assault offense. At sentencing, the trial court agreed with the State that it should vacate the second degree assault conviction because the drive-by shooting offense was the greater offense. And the jury found in a special verdict form that Gleason was armed with a firearm at the time he committed the crime of second degree assault only. Therefore, the corresponding firearm sentencing enhancement must be vacated on remand.

However, the State contends that the vacated second degree assault conviction constituted the greater offense, rather than the drive-by shooting conviction, because it had a longer standard

range sentence when considering the corresponding firearm sentencing enhancement. But the State's requested remedy is a form of affirmative relief that requires the State to have first filed a notice for cross-review. RAP 5.1(d) requires that a party seeking cross review file a notice of appeal or notice for discretionary review to obtain affirmative relief. *See State v. Kindsvogel*, 149 Wn.2d 477, 480-81, 69 P.3d 870 (2003). The State did not file a cross-appeal. As a result, RAP 5.1(d) precludes our review.

Even if RAP 5.1(d) did not preclude review, the State set up the error in the trial court when it argued that the drive-by shooting conviction was the greater offense during sentencing. Under the invited error doctrine, a party is prohibited from contributing to an error at trial and then complaining of it on appeal. *In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 124, 340 P.3d 810 (2014). During sentencing, the trial court initially believed that second degree assault was the greater offense. But the State argued that the court should find that the drive-by shooting conviction was the more serious offense and vacate the second degree assault conviction, with which the court agreed. Consequently, the State now is precluded under the invited error doctrine from claiming that the trial court erred in vacating the second degree assault conviction.[3]

Accordingly, we remand to the trial court to vacate the 36-month firearm sentencing enhancement.

---

[3] The State argues that the trial court's sentencing error resulted in an illegal sentence and cites to a number of cases to argue that we should correct the trial court's sentencing error even though the State agreed with the sentencing outcome. But those cases are distinguishable. And the State does not address why RAP 5.1(d) does not apply or how it did not invite the error at trial.

CONCLUSION

We affirm Gleason's drive-by shooting conviction and sentence, but we remand for the trial court to vacate the 36-month firearm sentencing enhancement.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
WORSWICK, P.J.

_____
VELJACIC, J.